# Illinois Official Reports

## Appellate Court

---

### *Control Solutions, LLC v. Elecsys*, 2014 IL App (2d) 120251

---

| | |
|---|---|
| Appellate Court Caption | CONTROL SOLUTIONS, LLC, Plaintiff-Appellant and Cross-Appellee, v. ELECSYS, a Division of DCX-CHOL Enterprises, Inc., Defendant-Appellee and Cross-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-0251 |
| Filed | June 23, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the cancellation of a contract for supplying controllers for military equipment, the judgment for plaintiff, the "sole source" supplier under the contract, was affirmed, notwithstanding plaintiff's contention on appeal that the trial court erred in admitting settlement communications in violation of Illinois Rule of Evidence 408, since the communications plaintiff objected to predated any dispute between the parties and did not fall within the scope of Rule 408, the jury clearly accepted defendant's theory that the contract contained a termination-for-convenience provision as a flow-down from defendant's underlying contract with the Army, and under the circumstances, plaintiff failed to establish that any proven elements of damages were ignored. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County; No. 09-L-1225; the Hon. Hollis L. Webster, Judge, presiding. |
| Judgment | Affirmed; cross-appeal dismissed. |

| Counsel on Appeal | Thomas I. Matyas, Tracy A. Hannan, and Erin L. Brechtelsbauer, all of Edwards Wildman Palmer LLP, of Chicago, for appellant. |
| | |
| | James F. McCluskey, James S. Harkness, Jennnifer L. Friedland, and Patrick R. Boland, all of Momkus McCluskey, LLC, of Lisle, for appellee. |

| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Jorgensen concurred in the judgment and opinion. |

**OPINION**

¶ 1 Plaintiff, Control Solutions, LLC, filed a complaint in the circuit court of Du Page County, alleging breach of contract by defendant, Elecsys, a division of DCX-CHOL Enterprises, Inc. The matter proceeded to a jury trial. The jury returned a verdict in favor of plaintiff and awarded damages in the amount of $106,950. Following the denial of the parties' posttrial motions, plaintiff filed a notice of appeal and defendant filed a notice of cross-appeal. In its appeal, plaintiff argues that the trial court committed reversible error by admitting settlement communications at trial in violation of Illinois Rule of Evidence 408 (eff. Jan. 1, 2011). Plaintiff also contends that, for various reasons, it was "deprived of a true jury trial" and therefore the jury's award of damages should be reversed and the matter remanded for a new trial on damages alone, or in the alternative a new trial on liability and damages. In its cross-appeal, defendant asserts that, if this court grants plaintiff's request for a new trial, the trial court's order finding moot defendant's "Unconscionability Motion" should be reversed and the motion should be considered on remand. For the reasons set forth below, we affirm the trial court's judgment and dismiss defendant's cross-appeal.

¶ 2 I. BACKGROUND

¶ 3 In February 2008, the Department of the United States Army (Army) solicited bids for the purchase of controllers to be delivered to the Rock Island Arsenal. The controllers are used in military equipment to assist in opening the doors of vehicles damaged in attacks. Under the terms of the Army's solicitation, the controllers were required to be obtained from a "sole source" supplier. The "sole source" supplier for the controllers at issue was plaintiff. As a result, any party wishing to contract to sell the controllers to the Army was required to first purchase the controllers from plaintiff.

¶ 4 Defendant decided to bid on the Army's contract. To this end, on February 20, 2008, Jill Hoover, defendant's contract administrator, requested a quote from plaintiff for the purchase

- 2 -

of 4,010 controllers, part number CS3225N. Later that same day, George Roy Kell, then plaintiff's director of business development, sent an email to Hoover that provided in relevant part:

> "THe [*sic*] price for the CS3225N is $930 @ at the 4-5K qtys. I will get you a formal quote tomorrow, the terms are FOB Origin, Net 30, NCNR [noncancellable, nonreturnable]. Delivery is 200/week, with a 10-12 week standard leadtime ARO [after receipt of order]. We understand this may be a DX rated contract, in which case we will typically do much better on the lead time with the contract and DX letter."[1]

In the same email, Kell asked Angelica Martinez, an employee in plaintiff's accounting department, to provide Hoover a formal quote the following day, noting that the "destination is Rock Island."

¶ 5    On February 21, 2008, Martinez provided Hoover a formal quote, quote No. Q020800004, incorporating the same terms as Kell's email, including the noncancellable language. Attached to the quote was a document entitled "Quotation Terms," which included an "Exceptions" clause providing in relevant part:

> "If Buyer's acceptance of a quotation, proposal, acknowledgment of an order, or order itself contains verbal, written, printed, or stamped provisions or conditions inconsistent with the verbal, written, printed or stamped provisions and conditions of the quotation, proposal or acknowledgment of order, the provisions and conditions of Control Solutions, Inc., shall prevail."

¶ 6    On or about March 3, 2008, after receiving plaintiff's formal quote, defendant entered into a contract with the Army, designated as contract number W9098S-08-P-0430, for the sale of 4,010 controllers, part number CS3225N. Under the terms of defendant's contract with the Army, the Army expected the first shipment of 200 controllers to be delivered to the Rock Island Arsenal by May 30, 2008.

¶ 7    On March 5, 2008, Shauna Shay, an employee in defendant's purchasing department, sent Kell the following email:

> "Per our convo [*sic*] this afternoon here is Purchase Order ELE0021671–for Quotation Number Q020800004[.] I have also attached a copy of [the] Government Rating Letter[.] Packaging Requirements (52.0000-4148) attached–per convo [*sic*] please send quotation to [my email address]."

Defendant's purchase order requested delivery of the first shipment of 200 controllers on May 13, 2008. In addition, the purchase order made the following reference: "THIS PO IS GOVERNED BY THE TERMS AND CONDITIONS FOUND AT HTTP://WWW. DCXCHOL.COM/DCX/SUP.HTML[.]" The terms and conditions on defendant's website provided that they "supersede any submitted by the Seller in any proposal or acknowledgment." The terms and conditions also provided that "[t]he Buyer may terminate this order in whole or in part at any time upon written or telegraphic notice to the Seller" and that the contract is subject to Federal Acquisition Regulations (FAR), including a termination-for-convenience provision under FAR 52.249 (48 C.F.R. § 52.249-2 (2006)). In

---

[1]According to testimony at trial, the government rates the priorities of its contracts. A DX rating is the highest priority, meaning that it takes precedence over other contracts. Although Hoover's request for a quote did not mention the contract's rating, Kell stated at trial that he had been told verbally by Hoover that the contract was DX rated.

addition, the terms and conditions set forth specific remedies for the seller in case the contract is terminated for convenience.

¶ 8    On March 6, 2008, Kell sent Shay an email notifying her that the price per controller with packaging, handling, and insurance was $946 each and that a formal quote would follow. Later that day, Martinez sent Shay a revised quote. As with the original quote, the revised quote advised that "[a]ll orders are non-cancelable." Attached to the revised quote were the same "Quotation Terms" that accompanied the original quote.

¶ 9    On March 14, 2008, Martinez sent Shay an email asking if she had revised the purchase order to reflect the new pricing of $946 per controller. Martinez also stated in the email that plaintiff would start shipping 200 pieces per week starting on May 13, 2008. On March 17, 2008, Shay responded that she had been asked by Mike Jamison, defendant's vice president, "to advise that parts should be wrapped in bubble wrap *** and sent in regular packaging box."

¶ 10    On March 20, 2008, defendant submitted a revised purchase order ELE0021671 for 4,211 controllers at $930 each. The revised purchase order requested that "order confirmation of increase" be sent to Shay's email address. In addition, as with the original purchase order, the revised purchase order referenced that it was governed by the terms and conditions found on defendant's website. On April 3, 2008, Martinez sent an email to Shay with the subject line "Revised Purchase order ELE0021671." In the email, Martinez wrote: "[P]lease take this email as confirmation of the above PO. I also attached a shipping schedule." The shipping schedule provided that weekly shipments of 200 controllers would commence on May 13, 2008, and continue through September 30, 2008, when a final shipment of 211 controllers would be made.

¶ 11    On April 24, 2008, Michael McKee, plaintiff's chief technology officer, sent the following email to Kell:

> "Please make sure we have not accepted [defendant's] PO. If we have, please let me know immediately. Their terms and conditions are unacceptable in their present form *** and we'll have to resolve the discrepancies before we give them any product."

Later the same morning, Kell emailed Martinez in reference to her April 3, 2008, email to Shay, stating, "This is an acknowledgment of the modified PO, do you have any record of acknowledgment of the original PO?"

¶ 12    On April 25, 2008, Shay sent Kell a revised purchase order ELE0021671, which contained a new shipping address. On May 12, 2008, Kell informed Shay by email that 200 controllers were scheduled to ship that week. However, in an email dated May 15, 2008, Shay noted that she received a call from Kell to inform her that, due to production delays, manufacture of the controllers was a week behind schedule.

¶ 13    Meanwhile, on May 19, 2008, Carrie Kammer, a contract specialist with the Army, sent an email to Nancy Melton, a representative of defendant. Kammer asked Melton to provide a cost estimate to the government for cancelling the contract for the controllers. Kammer advised that she was not sure that the Army would be cancelling, but that she needed the information to take to her superiors. Kammer further advised defendant to keep working on the order until further instruction. In response to Kammer's email, Melton wrote, "No parts can be cancelled. Our cost will be the total contract."

¶ 14    On May 20, 2008, Shay sent Kell an email requesting an update on defendant's order. In response, Kell wrote that plaintiff was "planning on a shipment of 200 pcs on Friday." The

email further provided, "Attached is our standard order acknowledgment, we need your acceptance of that prior to shipping." The order acknowledgment provided in part that "[a]ll orders are non-cancelable and non-returnable" and that "[c]ustomer acceptance of shipments or any other customer action from this acknowledgment shall signify acceptance of Control Solutions' general Terms and Conditions of Sale that have been provided (see attached)." The "Terms and Conditions of Sale" included a "Cancellation" clause that stated:

> "In the event that a contract is cancelled by Buyer, or by Control Solutions, Inc., because of default by the Buyer, then Buyer shall pay Control Solutions, Inc. for all damages sustained, including payment for partially or totally completed circuit boards or inventory required for the purpose of fulfilling said contract at the current applicable price."

Shay responded later the same day, writing, "On page 2 of order acknowledgment–states packaging in bubble wrap in cardboard box–5-10 per box–please note that each unit is to be packaged in its own box." On May 21, 2008, Shay sent to Kell by email a letter on defendant's letterhead. The letter paraphrased the order acknowledgment that Kell sent the prior day, including the provision that all orders are noncancellable, but included the packaging change requested by Shay.

¶ 15 Plaintiff shipped 100 controllers on or about May 23, 2008, and another 100 controllers on or about May 27, 2008. Defendant paid in full for the 200 shipped controllers. In an email to defendant dated May 29, 2008, Kell acknowledged that plaintiff was "behind *** our confirmed delivery plan." Attributing the delay to "a supply chain issue," Kell promised to have a "recovery plan" the following week and noted that plaintiff had "decided to ship the parts to [defendant] in the custom boxes and absorb the cost."

¶ 16 Meanwhile, in a letter dated May 28, 2008, the Army notified defendant that "[p]ursuant to the clause of the contract entitled 'Termination for Convenience of the Government,' FAR 52.249-2, you are hereby notified that contract #W9098S-08-P-0430 is completely terminated effective May 28, 2008." The letter also instructed defendant to "[s]top all work immediately, terminate subcontracts, and place no further orders except to the extent that you or a subcontractor wish to retain and continue any work-in-process or other material for your own account. Telegraph or datafax similar instructions to all subcontractors and suppliers."

¶ 17 On June 5, 2008, Shay sent plaintiff the following email:

> "I have attached a copy of letter from Department of the Army regarding Contract W9098S-08-P-0430, for all components purchased from Control Solutions on Purchase Order ELE0021671. This letter is a stop all work immediately order–due to engineering change because of weight of components. Please advise where Control Solutions is in production and any cancellation costs that there maybe [*sic*]."

In response, Kell informed Shay that plaintiff "will meet to gather the non-cancellable obligated costs and *** get back to you." In an email dated June 12, 2008, Kell wrote to defendant, "FYI, we have analyzed the situation, we have shipped 200 units to you so far, out of the 4211 total on the PO, leaving a balance of 4011. Our contract is NCNR, so at $930@, the cancellation liability is $3,730,230." In response, Jamison wrote Kell that, when he received the cancellation audit forms from the Army, he would submit them to plaintiff to complete.

¶ 18 On August 26, 2008, Shay sent Kell the following email:

"I have been asked by Mike Jamison to contact you regarding information needed for government. If possible please provide the following[.]

How many pcs are built and ready for shipment[?]

What is the component inventory for this order that you have at your location and cost on this[?]

If you can provide cost break down and send via email to myself or fax."

Shay informed Kell that the information was required no later than September 5, 2008.

¶ 19   On September 5, 2008, Kell sent Shay an email with the title "Information Needed 8.26.2008 Request" in the subject line. The email provided as follows:

"After review, CSI has determined the following liability. Since the CS3225N is a modified COTS [commercial off-the-shelf] product, there is significant commonality with other CSI products. This means that the Finished Product only is unique. As such, CSI is willing to consider foregoing [*sic*] the true cancellation charges of 100% of the balance of the PO. This offer is predicated on the expectation that a speedy resolution of this matter will occur, as we are a small business and a cancellation of this magnitude is a significant impact on our financial status and cash flow as we planned both material and capacity to accomplish the expected delivery schedule.

1. Finished Goods–100 pcs at $930@=$93,000
2. WIP [works in process]–none, all WIP can be reallocated to other products
3. Raw Materials–none, all Raw can be reallocated to other products
4. Lost Profits–As this PO was NCNR, we expect to recover lost profits on the balance of the unshipped units. Note that the issuance of this PO to CSI caused us to add capacity for the entire order. We are submitting for 15% lost profits on the balance of the order, assuming the 100 pcs of Finished Good [*sic*] are shipped and paid for. Our records show that we have shipped and received payment for 200 units of the total 4211 on the PO, leaving a balance of 4011. If the 100 pcs of [Finished Goods] are shipped and paid for, the new balance will be 3911. At a sell price of $930, that leaves a balance of $3,637,230 due on the PO. At 15% profit as a % of sales, that is a lost profit of $545,584.50.

Please let me know if you have any questions, and your expected time to process these payments."

¶ 20   On September 25, 2008, defendant submitted to the Army standard form 1435, entitled "Settlement Proposal (Inventory Basis)." Defendant's proposal listed 100 finished controllers at $930 each, for a total of $93,000. Defendant also requested 11.4% of the cost of the 100 finished controllers, or $10,602, for "general and administrative expenses." On October 7, 2008, Kell wrote to defendant regarding the status of the cancellation. Jamison responded that a claim was submitted to the Army late in September and that he would check the status.

¶ 21   On December 29, 2008, plaintiff generated invoice No. 10260, billing defendant for $638,584.50, consisting of $93,000 for the 100 finished but unshipped controllers and $545,584.50 as a 15% lost profit charge on the balance of the unfinished units. Kell informed Jamison of the invoice by email the following day, writing, "as of my last communication with your contracts person just prior to Christmas break, I understand the final settlement is not yet signed by the government, and we do not know the terms." Kell explained, nevertheless, that plaintiff was issuing the invoice because it needed "to get our books in order for the end of the

year." Martinez posted the total amount of the invoice ($638,450.50) in plaintiff's books as an accrued receivable.

¶ 22    Ultimately, the Army determined that the settlement proposed by defendant was fair and reasonable. Accordingly, early in January 2009, defendant and the Army finalized a document titled "Modification of Contract," which reflected an agreement reached between the Army and defendant.

¶ 23    On March 30, 2009, plaintiff sent defendant an email inquiring about the status of the "past due" invoice. In response, on March 31, 2009, Shay wrote Jamison, stating that on March 19, 2009, she contacted plaintiff and spoke with Paul Abbott. Shay informed Abbott that the cost amount on the invoice for the 15% lost profit charge "needs to be removed based on the fact that Purchase Order ELE0021671 was placed with Government flow down requirements of Contrat [*sic*] W9098S-08-P-0430, which means that [plaintiff] is unable to invoice for loss [*sic*] profit because [the] government does not allow payment for loss [*sic*] profit." Shay further indicated that she asked plaintiff "that a letter stating the finial [*sic*] settlement in the amount of $93,000.00 be sent via email or fax on company letter head, and that payment would be able to be processed for $93,000.00 the following day." In an email to plaintiff dated April 1, 2009, Jamison explained that the purchase order that defendant submitted to plaintiff "was a flow down contract" from the United States government. Jamison added that the government "does not allow profit on a cancelled orders [*sic*] where parts are not delivered."

¶ 24    On April 2, 2009, McKee and Kell engaged in an internal email exchange. As part of the exchange, McKee asked if Kell had indicated that lost profits were allowed. Kell replied, "I said I was going to claim them. I still think we need a legal/contracts opinion because of our way of acknowledging the PO's [*sic*]." McKee answered, "Sure–I thought u [*sic*] said that there were provisions in the FAR for this. Either way, I agree with your approach." Kell responded, "Actually, I had done it successfully in the past, but I had contracts and legal backup."

¶ 25    On September 25, 2009, plaintiff filed suit against defendant for breach of contract. On May 31, 2011, defendant filed a "Motion for Evidentiary Hearing and for Summary Judgment as to the Issue of Contract Unconscionability" (Unconscionability Motion). In the Unconscionability Motion, defendant alleged that plaintiff's last-minute demand that defendant accept the order acknowledgment before plaintiff would ship the controllers was unconscionable as a matter of law and that therefore the noncancellable language in the order acknowledgment should not be enforced against defendant. On September 21, 2011, the trial court denied the Unconscionability Motion without prejudice to its being raised after the court heard the evidence at trial.

¶ 26    On October 25, 2011, plaintiff filed various pretrial motions, including a "Motion *in limine* to Exclude Evidence of Settlement" pursuant to Illinois Rule of Evidence 408 (eff. Jan. 1, 2011). In its motion, plaintiff claimed that, following defendant's cancellation of the contract, the parties engaged in settlement discussions. Plaintiff asserted that, to this end, on September 5, 2008, it conveyed to defendant by email a settlement offer in the total amount of $638,584.50. Plaintiff further asserted that it followed up on this offer in December 2008, when it sent an invoice to defendant for the same amount. According to plaintiff, defendant recognized that its offer was a "settlement overture" when, late in March 2009, Shay sent an email with a "counteroffer" of $93,000. The trial court denied plaintiff's motion, finding that the parties' communications "predate the dispute here." The court allowed that plaintiff "may

argue, at the time of trial, that this was simply an attempt to settle," but added that "based upon what was submitted *** [the communications at issue] are not excluded as offers of settlement." Plaintiff renewed its objection at the start of the trial, but it was again overruled.

¶ 27 The case was tried before a jury from November 7, 2011, through November 15, 2011. The jury heard from 10 witnesses, including McKee, Jamison, Hoover, Shay, Martinez, Kell, and 2 representatives from the Army. In its closing argument, plaintiff maintained that the "final signed writing" between the parties was formed on May 21, 2008, when defendant sent plaintiff a letter paraphrasing the order acknowledgment, including the noncancellable language. Plaintiff further argued that defendant's cancellation of the contract was a breach, for which plaintiff was entitled to recover the remaining contract value minus any expenses saved by the breach. Plaintiff calculated this amount at $2.7 million. Defendant's theory was that a contract was formed when plaintiff confirmed the purchase order on April 3, 2008. Defendant argued that, pursuant to its agreement with plaintiff, defendant could, and did, terminate the contract for convenience. Defendant further argued that its terms and conditions "specifically incorporate the government flow-down," *i.e.*, if the government terminates its contract with defendant, then the contract between plaintiff and defendant also terminates. Defendant also posited that, pursuant to government regulations, plaintiff's damages were limited to completed items and raw and semiprocessed materials, but not profits.

¶ 28 On November 15, 2011, following deliberations, the jury determined that plaintiff proved that a contract had been formed, that defendant breached the contract, and that plaintiff sustained damages as a result. The jury awarded damages totaling $106,950, consisting of $93,000 for the finished but unshipped goods plus 15% of that amount, or $13,950, which the jury categorized as "lost potential investment income."

¶ 29 On November 29, 2011, defendant filed a motion for judgment notwithstanding the verdict. On the same date, plaintiff filed a motion for additur, or, in the alternative, a new trial on the issue of damages alone, and for, in the other alternative, a new trial on the issues of liability and damages. In support of its motion, plaintiff argued that the jury's award of damages was not based upon the evidence or the submitted instructions. Plaintiff also claimed that it sustained prejudicial error because the trial court erroneously admitted evidence of the parties' settlement discussions.

¶ 30 Meanwhile, on December 6, 2011, the trial court revisited defendant's Unconscionability Motion and ruled that it was moot. The court explained:

"The jurors' finding that a contract did exist between the parties, and that it was breached by Defendant ElecSys' failure to pay $93,000 plus $13,950 of loss [*sic*] potential investment income, or 15 percent, means, in this court's opinion, that the jurors found the contract between these parties included the terms and conditions contained in the purchase order of ElecSys which included a provision for cancellation for convenience as a flow-down from the government contract.

It is uncontested that a pallet of a hundred controllers was produced by Control Solutions under the terms of this contract, and that ElecSys never paid for these controllers or forwarded the funds received by the government for reimbursement following its cancellation of the contract. The cost for the controllers was $93,000.

Therefore, the jury did not consider the order acknowledgment signed by Mr. Jamison on 5/20/2008 [*sic*] that contained a noncancelable, nonreturnable clause as a part of the contract."

¶ 31    On February 2, 2012, the trial court heard oral arguments on the parties' posttrial motions. The trial court denied the motions in their entirety. The court also commented upon its ruling with respect to plaintiff's motion *in limine* regarding settlement discussions, stating:

> "I do want to make the record clear for a higher court because I don't have a transcript before me or the specific quotes of my ruling[ ] ***, but I want the Second District to understand the basis of my ruling on this very important motion *in limine* relative to the claim that those documents and emails fell within a category of settlement documents that for public purposes–public policy purposes should be excluded from the jury.

> My finding did not, and I underscore that, did not be [*sic*] solely based upon the fact that it was prefiling.

> My ruling was based upon my call at that time and my continued position that these documents did not fall within the category of settlement documents.

> It was argued that they were, and I understand your argument certainly, and I understand the importance of that, and it was argued to the contrary by defense, and I made a judgment call that based upon the content of those documents, they simply did not fall within the bar of permissible evidence to a jury relative to prefiling settlement negotiations.

> So, I just want that to be clear because my recollection of the ruling is somewhat different than the argument that was made here, and if I did not articulate myself clearly at the time, I wanted–I want to do so now."

The court entered judgment on the jury verdict on February 2, 2012. On March 5, 2012, plaintiff filed a notice of appeal. On March 15, 2012, defendant filed a notice of cross-appeal.

¶ 32                                   II. ANALYSIS
¶ 33                                 A. Plaintiff's Appeal
¶ 34                           1. Illinois Rule of Evidence 408

¶ 35    On appeal, plaintiff first argues that the trial court committed reversible error and contravened well-established Illinois public policy by admitting its September 5, 2008, email and "related communications," because they constituted offers of compromise protected by Illinois Rule of Evidence 408 (eff. Jan. 1, 2011) (Rule 408). Defendant responds that the trial court did not abuse its discretion in admitting the communications at issue, because plaintiff failed to establish that the communications were settlement communications. Defendant argues that, even if we determine that the communications constituted settlement communications, they fall within an exception to Rule 408 and, in any event, their admission was harmless error.

¶ 36    The Illinois Rules of Evidence became effective on January 1, 2011. Prior to their promulgation, Illinois courts routinely held that matters relating to offers of compromise and negotiations for settlement were generally inadmissible. See *Liberty Mutual Insurance Co. v. American Home Assurance Co.*, 368 Ill. App. 3d 948, 960 (2006); *Garcez v. Michel*, 282 Ill. App. 3d 346, 348-49 (1996); *Barkei v. Delnor Hospital*, 176 Ill. App. 3d 681, 694 (1988); *Sawicki v. Kim*, 112 Ill. App. 3d 641, 644 (1983). Two justifications were offered for this rule. First, courts held that negotiations and compromises do not constitute admissions of liability and are therefore irrelevant. *County of Cook v. Illinois Labor Relations Board, Local Panel*,

2012 IL App (1st) 111514, ¶ 32; *Liberty Mutual Insurance Co.*, 368 Ill. App. 3d at 960; *Garcez*, 282 Ill. App. 3d at 349; *Barkei*, 176 Ill. App. 3d at 694; see also Michael H. Graham, Graham's Handbook of Illinois Evidence § 408.1 (10th ed. 2010). Second, courts reasoned that admitting evidence of negotiations and compromises violates public policy by discouraging litigants from settling their disputes without the need for trial. *County of Cook*, 2012 IL App (1st) 111514, ¶ 32; *Liberty Mutual Insurance Co.*, 368 Ill. App. 3d at 960; *Garcez*, 282 Ill. App. 3d at 349; *Barkei*, 176 Ill. App. 3d at 694; *Sawicki*, 112 Ill. App. 3d at 644-45; see also Michael H. Graham, Graham's Handbook of Illinois Evidence § 408.1 (10th ed. 2010).

¶ 37        The common-law principles relating to the admissibility of settlement communications were codified by Rule 408. Rule 408 is divided into two parts. Subdivision (a) of the rule identifies prohibited communications and provides:

> "(a) Prohibited Uses. Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
> > (1) furnishing or offering or promising to furnish–or accepting or offering or promising to accept–a valuable consideration in compromising or attempting to compromise the claim; and
> > (2) conduct or statements made in compromise negotiations regarding the claim." Ill. R. Evid. 408(a) (eff. Jan. 1, 2011).

Subdivision (b) of the rule recognizes exceptions to the inadmissibility of certain communications. Ill. R. Evid. 408(b) (eff. Jan. 1, 2011). Thus, Rule 408(b) does not require the exclusion of any evidence otherwise discoverable, even if it is presented in the course of settlement negotiations. Ill. R. Evid. 408(b) (eff. Jan. 1, 2011). In addition, subdivision (b) does not require exclusion if the evidence is offered for a purpose not prohibited by Rule 408(a), such as proving a witness's bias. Ill. R. Evid. 408(b) (eff. Jan. 1, 2011).

¶ 38        For Rule 408 to apply, the communications must concern a claim actually in dispute as to the validity or amount at the time of the negotiations, or an apparent difference of opinion, and the communications must relate to that claim. *Bank of America, N.A. v. Sea-Ya Enterprises, LLC*, 872 F. Supp. 2d 359, 363 (D. Del. 2012); *Prudential Insurance Co. of America v. Curt Bullock Builders, Inc.*, 626 F. Supp. 159, 164 (N.D. Ill. 1985).[2] The party seeking exclusion of the alleged settlement communications must make a "substantial showing" that the communications were, in fact, part of an attempt to settle a disputed claim. *Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1241 (7th Cir. 1995); *United States v. Mirama Enterprises, Inc.*, 185 F. Supp. 2d 1148, 1156-57 (S.D. Cal. 2002). In making this determination, a court examines the totality of the circumstances, carefully reviewing the contents of the communications and their timing. *Raybestos Products*, 54 F.3d at 1241; see also *County of Cook*, 2012 IL App (1st) 111514, ¶ 41. We note, however, that one party's description of its communication as a "settlement offer" does not automatically bar the communication under Rule 408. See *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1343 (9th Cir. 1987). It is

---

[2]Illinois Rule of Evidence 408 is modeled after Federal Rule of Evidence 408. See *County of Cook*, 2012 IL App (1st) 111514, ¶ 35 (noting that Rule 408 "mirrors" its federal counterpart). As such, we find cases interpreting the federal rule persuasive as to the interpretation and application of the Illinois rule.

within the trial court's sound discretion to determine the admissibility of evidence pursuant to Rule 408, and a reviewing court will not overturn the trial court's decision absent an abuse of that discretion. See *Liberty Mutual Insurance Co.*, 368 Ill. App. 3d at 960; *Garcez*, 282 Ill. App. 3d at 348; *Nardi v. Kamerman*, 196 Ill. App. 3d 591, 596 (1990). The abuse-of-discretion standard is the most deferential standard of review, next to no review at all. *People v. Holman*, 402 Ill. App. 3d 645, 650 (2010). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position taken by the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 39     As noted above, plaintiff challenges the trial court's ruling that its September 5, 2008, email and "related communications" were not offers of compromise protected by Rule 408. Initially, plaintiff suggests that reversal is warranted because the trial court "drew an arbitrary line between pre- and post-litigation offers of compromise, holding that only post-litigation settlement communications were inadmissible under Rule 408." We agree that the application of Rule 408 does not depend on the timing of a party's lawsuit. See *Cook v. Korshak*, 301 Ill. 603, 610 (1922) (holding that testimony as to settlement was improper regardless of whether the settlement offer was made before or after the suit began); *Schnuck Markets, Inc. v. Soffer*, 213 Ill. App. 3d 957, 979-80 (1991) (holding that settlement negotiations occurring before filing of lawsuit were inadmissible); see also *Alpex Computer Corp. v. Nintendo Co.*, 770 F. Supp. 161, 163-64 (S.D.N.Y. 1991) (noting that litigation need not have actually commenced for Rule 408's federal counterpart to apply); Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:58 (4th ed. 2009) ("[Federal Rule of Evidence 408] applies when the dispute arises even if no suit has been filed, and even if neither party has formally rejected the position of the other ***. So long as the parties have expressed disagreement on the amount owing or on the validity of the claim, the Rule applies."). Nevertheless, we conclude that plaintiff misconstrues the rationale for the trial court's ruling.

¶ 40     Significantly, when the trial court initially ruled on plaintiff's motion *in limine*, it did not state that the communications were admissible because they predated the filing of plaintiff's suit. Rather, the court concluded that, "based upon what was submitted," the communications at issue "are not excluded as offers of settlement," because they "predate the *dispute* here." (Emphasis added.) Indeed, the existence of a dispute is at the very core of whether communications are inadmissible under Rule 408. *Bank of America, N.A.*, 872 F. Supp. 2d at 363 (noting that Federal Rule 408 excludes only communications that reflect an actual dispute or an apparent difference of view); *Prudential Insurance Co. of America*, 626 F. Supp. at 164 (noting that a claim "must actually be in dispute" to fall within the scope of Federal Rule 408). To the extent that there were any doubts regarding the basis for the trial court's ruling, the court resolved them on February 2, 2012, when, in denying plaintiff's posttrial motions, it emphasized that its ruling on plaintiff's motion *in limine* was based principally upon its position that the communications at issue "did not fall within the category of settlement documents." In other words, the trial court concluded that the communications at issue did not constitute settlement documents protected by Rule 408, because, when they were made, there was no actual or apparent dispute.

¶ 41     Plaintiff, however, also insists that reversal is warranted because, in fact, a *bona fide* dispute over damages existed when it sent its September 5, 2008, email. According to plaintiff, in June 2008 it demanded payment from defendant in the amount of $3,730,230, the remaining contract value, on the basis that the termination of the contract violated the contract's

- 11 -

noncancellable provision. Plaintiff claims that defendant refused to pay this amount, disputing that it owed plaintiff anything other than the cost of any completed controllers. Thus, plaintiff reasons, the parties had "conflicting opinions" concerning the amount owed plaintiff and an actual dispute existed for purposes of Rule 408. Plaintiff further asserts that the circumstances in this case are similar to those in *Davis v. Rowe*, No. 91 C 2554, 1993 WL 34867 (N.D. Ill. Feb. 10, 1993), where the court found that the federal counterpart to Rule 408 applied to the parties' pre-litigation communications. We do not find plaintiff's arguments persuasive.

¶ 42 In particular, the record establishes that on June 5, 2008, Shay sent plaintiff an email notifying it of the Army's decision to terminate its contract with defendant. In her email, Shay asked plaintiff to immediately stop all work and to "advise where [plaintiff] is in production and any cancellation costs that there maybe [*sic*]." In response, Kell informed Shay that plaintiff "will meet to gather the non-cancellable obligated costs and *** get back to you." A week later, Kell wrote to defendant, "FYI, we have analyzed the situation, we have shipped 200 units to you so far, out of the 4211 total on the PO, leaving a balance of 4011. Our contract is NCNR, so at $930@, the cancellation liability is $3,730,230." Jamison responded on defendant's behalf and informed Kell that, when defendant received the cancellation audit forms from the Army, it would submit them to Kell to complete.

¶ 43 On August 26, 2008, defendant sent an email to plaintiff, requesting specific information on cancellation costs that it needed to provide to the Army, including a breakdown of costs. Kell responded that plaintiff "will start the analysis." On September 5, 2008, Kell sent Shay an email with the title "Information Needed 8.26.2008 Request" in the subject line. The email detailed plaintiff's cancellation costs, including finished goods, works in process, raw materials, and lost profits. In his email, Kell also noted that all works in process and raw materials could be allocated to other products. Thereafter, defendant submitted to the Army a "Settlement Proposal." On October 7, 2008, Kell wrote to defendant regarding the status of the cancellation. Jamison responded that a claim was submitted to the Army late in September and that he would check the status.

¶ 44 Based on the timeline set forth above, we cannot say that the trial court's decision not to exclude as offers of settlement under Rule 408 the September 5, 2008, email and related communications was an abuse of discretion. The trial court could have reasonably concluded that the communications at issue constituted an effort to identify and submit cancellation costs to the Army for reimbursement as a result of the Army's termination for convenience of its contract with defendant. Significantly, the communications were not adversarial. Shay merely requested an itemized list of cancellation costs in order to complete a settlement form that defendant was required to submit to the Army. Kell authored the September 5, 2008, email in direct response to Shay's request. Moreover, Kell's follow-up communication in October 2008 did not hint at a burgeoning dispute. It merely requested an update on defendant's submission to the Army. See *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1373 (10th Cir. 1977) (finding that discussions had not crystallized to the point of threatened litigation, a clear cut-off point, and were therefore simply "business communications").

¶ 45 Plaintiff also suggests that the December 2008 invoice constituted an offer of compromise and therefore should have been protected by Rule 408. Again, we do not agree. In the email informing defendant of the invoice, Kell acknowledged that he was aware that defendant had not yet reached a settlement with the Army, but he said that plaintiff was generating the invoice "to get our books in order for the end of the year." Thus, the evidence suggests that the invoice

- 12 -

was generated merely for bookkeeping purposes and was not intended as an offer of settlement or a document in settlement negotiations. See *Winchester Packaging, Inc. v. Mobil Chemical Co.*, 14 F.3d 316, 319 (7th Cir. 1994) ("[A] bill that itemizes what the sender thinks the recipient owes him and demands–even under threat of legal action–payment is not an offer in settlement or a document in settlement negotiations and hence is not excludable by force of Rule 408."). Accordingly, we cannot say that the trial court's ruling that the December 2008 invoice did not fall within the scope of Rule 408 was arbitrary, fanciful, or unreasonable, or that no reasonable person would agree with the trial court's position that the invoice was not intended as an offer of settlement or a document in settlement negotiations.

¶ 46    As noted above, plaintiff relies heavily on *Davis*, 1993 WL 34867, for the proposition that an actual dispute existed in this case. In *Davis*, the plaintiff, an art owner, had consigned art to the defendant, a gallery owner, and the art was subsequently destroyed in a gallery fire. The plaintiff sued the defendant to recover the value of the lost art. To establish value, the plaintiff attempted to introduce communications that occurred between the defendant and its insurer shortly after the fire. In particular, the defendant notified the insurer of a claim to recover projected sales of the lost art. The insurer disputed the defendant's right to recover lost projected sales. In connection with their disagreement over the defendant's right to lost sales, the defendant notified the insurer that the value of the lost art was $4,635,000. The defendant testified that the purpose of providing this valuation was to convince the insurer that the projected-sales claim was reasonable and "to settle the business interruption claim without suit." *Id.* at *3. The plaintiff sought to use this communication to establish the value of the art in the lawsuit against the defendant, and the defendant objected on the ground that the evidence was inadmissible under Federal Rule of Evidence 408.

¶ 47    In rejecting the plaintiff's contention that no dispute existed between the defendant and its insurer at the time of the disputed communication, the court found that, once the insurer informed the defendant that it would oppose any claim based on projected sales under the business interruption insurance, "an actual dispute arose between [the parties] to which [Federal] Rule 408 applied." *Id.* The court further held that the valuation letter was "part of a negotiation effort" and therefore inadmissible at trial, including to prove the value of the lost art. *Id*. The court also refused to admit a prelawsuit offer by the defendant to pay the plaintiff a portion of any recovered insurance proceeds in exchange for a release from liability. *Id.* at *4. The court found that, while the parties had agreed that the defendant owed the plaintiff some of the insurance proceeds, they "were not in agreement over the exact amount owed at the time" and thus a dispute for purposes of Federal Rule 408 existed. *Id*.

¶ 48    We find *Davis* to be distinguishable for several reasons. Significantly, the *Davis* court found an inherent adversarial relationship between an insurer and an insured–a relationship that is not present in the breach-of-contract action here. *Id.* at *3. We also note that in *Davis* the parties had both retained outside counsel when the communications took place, the insurer had retained an accounting expert, and the insured and its counsel engaged in settlement discussions with the insured's adjuster around the time of the communications. *Id.* at *3-4. Here, in contrast, the parties did not retain counsel until 2009 and they did not engage in any meetings to discuss a potential settlement.

¶ 49    As noted above, defendant contends that, even if the communications at issue were protected by Rule 408, any error in their admission was harmless. See *Niehuss v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 143 Ill. App. 3d 444, 452-53 (1986) (noting that where it

appears that an error did not affect the outcome of the trial, or where the court can see from the entire record that no injury has been done, the judgment will not be disturbed). Plaintiff counters that the admission of the communications at issue was far from harmless. We agree with defendant. Although the September 5, 2008, email and the December 29, 2008, invoice indicated that plaintiff completed 100 controllers, the controllers cost $930 per unit, and plaintiff reallocated its works in process and raw materials, this evidence is also found in a number of other places in the record without reference to the September 5, 2008, email or the December 29, 2008, invoice. Additionally, although the parties do not point to any evidence other than the September 5, 2008, email and the December 29, 2008, invoice to establish plaintiff's claim for 15% lost profits, the jury's use of this damages calculation did not prejudice plaintiff. Indeed, it benefitted plaintiff. Had the jury adopted defendant's calculation of damages, it would have awarded only $93,000 for finished goods and no "lost potential investment income."

¶ 50    In short, based on the evidence of record, the trial court could have reasonably concluded that plaintiff failed to make a substantial showing that an actual or apparent dispute existed between the parties when the communications at issue were exchanged. Moreover, even if the disputed communications were improperly admitted, any error was harmless where some of the information was elicited in testimony and exhibits outside of the purported settlement communications and where other information benefitted plaintiff. We therefore decline to overturn the trial court's judgment on this basis.

¶ 51                                B. Damages

¶ 52    Next, plaintiff requests reversal of the jury's award of damages. The jury was given several instructions related to the issue of damages. Jury Instruction 11 provided in relevant part:

> "You must decide whether Control Solutions sustained damages as a result of a breach by Elecsys.
>
>                            * * *
>
> Control Solutions must prove it sustained damage resulting from Elecsys' breach. To recover on its claim, Control Solutions must prove that because Elecsys breached its promises under the contract, Control Solutions has been damaged by not receiving the full value of its contract with Elecsys to which it is entitled.
>
> Elecsys denies that Control Solutions sustained damage or sustained damage to the extent claimed."

Jury Instruction 13 provided:

> "If you find in favor of Control Solutions, you must then decide how much money, if any, would fairly compensate Control Solutions for the breach of the contract by Elecsys. Control Solutions has the burden of proving each element of damages claimed and that they occurred as a direct and natural result of a breach by Elecsys. In calculating Control Solution's damages, you should determine that sum of money that will put Control Solutions in as good a position as it would have been in if both Control Solutions and Elecsys had performed all of their promises under the contract.
>
> Control Solutions seeks an award for direct damages for Elecsys' failure to make payment to Control Solutions pursuant to the contract.

'Direct Damages' are the amount of gain Control Solutions would have received if the parties had fully performed the contract. You calculate the amount of this gain by determining the value of the contract benefits Control Solutions did not receive because of Elecsys' breach and then subtracting from that value, the amount you calculate the value of whatever expenses Control Solutions saved because of the breach."

¶ 53    The verdict form required the jury to provide yes-or-no answers to the following six questions: (1) Did plaintiff prove that there was a contract? (2) Did plaintiff prove that it performed its obligations under the contract or had a valid excuse for not doing so? (3) Did plaintiff prove that defendant breached the contract by its failure to perform its obligations under the contract? (4) Did plaintiff prove that it sustained damages? (5) Did plaintiff prove that the damages it suffered were caused by defendant's breach of contract? and (6) Did plaintiff present evidence from which you can determine the fair and reasonable value of the loss? The jury answered each of the foregoing questions in the affirmative. The remainder of the verdict form was dedicated to calculating damages. It provided:

"7. What is the value of the contract benefits Control Solutions proved it should have received:

[a] = $ _____

What are the expenses Control Solutions saved because of the breach:

[b] = $ _____

8. Control Solution's Total Direct Damages (a minus b):

[c] = $ _____"

With respect to line 7[a] of the verdict form, the jury determined that the value of the contract benefits that plaintiff proved it should have received was $93,000 plus $13,950, or a total of $106,950. To the left of line 7[a] the jury indicated that the $13,950 represented 15% of the $93,000 award for "lost potential investment income." The jury left blank line 7[b]. The jury wrote $106,950 on line 8[c].

¶ 54    Plaintiff argues that it was deprived of a "true jury trial" and that therefore the jury's award should be reversed and the cause remanded for a new trial on the issue of damages, or alternatively on the issues of liability and damages. In particular, plaintiff asserts that the jury's damages award should be reversed because: (1) the jury ignored proven elements of damages; (2) the award resulted from prejudice; and (3) the award bears no reasonable relationship to the loss sustained. Defendant responds that the award of damages is not against the manifest weight of the evidence, as the jury accepted its theory of liability and damages.

¶ 55    The question of damages is peculiarly one of fact. *Snover v. McGraw*, 172 Ill. 2d 438, 447 (1996). Accordingly, in a jury trial, it is the function of the jury to weigh contradictory evidence, to judge the credibility of the witnesses, and to draw the ultimate conclusion as to the facts. *Profit Management Development, Inc. v. Jacobson, Brandvik & Anderson, Ltd.*, 309 Ill. App. 3d 289, 306 (1999). Courts of review are reluctant to interfere with a jury's discretion in assessing damages and will overturn an award only if it is against the manifest weight of the evidence. *Profit Management Development, Inc.*, 309 Ill. App. 3d at 306. Thus, a reviewing court will not upset a jury's award of damages unless a proven element of damages was ignored, the verdict resulted from prejudice, or the award bears no reasonable relationship to

the loss suffered. *Watson v. South Shore Nursing & Rehabilitation Center, LLC*, 2012 IL App (1st) 103730, ¶ 32; *Profit Management Development, Inc.*, 309 Ill. App. 3d at 306.

¶ 56 Plaintiff first argues that the jury's award of damages should be reversed because the jury ignored proven elements of damages and fashioned its own measure of damages. Plaintiff notes that the jury found in its favor with respect to the initial six questions on the verdict form. Yet, plaintiff complains, "when it came to calculating *** direct damages, the jury awarded only what it perceived–based upon inadmissible settlement communications–[plaintiff] had expended at the time [defendant] breached the contract, plus 'lost potential investment income,' which had no supporting evidence at all." According to plaintiff, the "actual evidence" established that the remaining contract value when defendant breached the contract was $3,730,230 and that the expenses plaintiff saved because of the breach were $952,532.28, for total direct damages of $2,777,697.72.

¶ 57 Plaintiff's position ignores evidence that the contract terms and damages were controverted in this case. While the parties do not appear to dispute the formation of a contract, we note that the jury was presented with two conflicting theories as to when the contract was formed, the terms of the contract, and the resulting damages from the cancellation of the contract. These are questions of fact that the jury was tasked with deciding. *Profit Management Development, Inc.*, 309 Ill. App. 3d at 306. In particular, plaintiff argued that the contract was formed on May 21, 2008, when defendant agreed to the terms and conditions set forth in the order acknowledgment attached to Kell's correspondence of May 20, 2008, which included a provision that the contract was noncancellable. Plaintiff argued that its damages were the value of the contract it should have received less any expenses saved as a result of the breach, which, as noted above, it calculates at $2,777,697.72. In contrast, defendant's position was that the parties formed a contract on April 3, 2008, when Martinez sent an email to defendant confirming the purchase order of March 20, 2008, which included a termination-for-convenience provision. Defendant argued that plaintiff's damages were the value of any completed but unshipped goods plus works in process and raw materials.

¶ 58 Thus, plaintiff could have received the full amount of its claimed damages only if the jury found that the contract was not formed until May 21, 2008, when defendant returned the order acknowledgment, and that the noncancellable provision in the order acknowledgment applied. However, the verdict form makes clear that the jury did not accept plaintiff's theory of liability. Indeed, the trial court recognized that the jury accepted defendant's theory of liability, stating, "the jurors found the contract between these parties included the terms and conditions contained in the purchase order of Elecsys which included a provision for cancellation for convenience as a flow-down from the government contract."

¶ 59 Plaintiff further asserts that, in contravention of the jury instructions and the verdict form, the jury did not identify the remaining value of the contract or the expenses that plaintiff saved by the breach. We disagree. Again, plaintiff's argument is based on the premise that the jury was required to accept its theory of liability. As noted above, however, it is clear that the jury accepted defendant's theory of liability, *i.e.*, the contract between these parties included the terms and conditions contained in defendant's purchase order, including a termination-for-convenience provision as a flow-down from the government contract. Indeed, the jury was expressly instructed that defendant "denies that [plaintiff] sustained damage *or sustained damage to the extent claimed*." (Emphasis added.) On this basis, it is clear that the jury found that "the value of the contract benefits [plaintiff] proved it should receive" was

$93,000 and that plaintiff did not save any expenses because of the breach. These findings were reasonable inferences from the evidence presented at trial. *Bonnier v. Chicago, Burlington & Quincy R.R. Co.*, 2 Ill. 2d 606, 614 (1954); *Profit Management Development, Inc.*, 309 Ill. App. 3d at 306. While neither party specifically requested that the jury award 15% of the finished goods as "lost potential investment income," the jury was presented with evidence that plaintiff sought 15% in lost profits. Moreover, as noted earlier, given that the "lost potential investment income" was not a damages award proposed by either party, plaintiff actually benefitted from this portion of the award.

¶ 60    Plaintiff nevertheless insists that, if defendant believed that the damages should be based on finished goods or "lost potential investment income," it should have requested a corresponding instruction. In particular, plaintiff references Illinois Pattern Jury Instructions, Civil, No. 700.16 (2011), which states in pertinent part, "In their contract, the parties agreed to the following: [state here the contract terms regulating damages] ***." However, the jury was charged with finding the parties' contract terms. As such, it would have made little sense for this instruction to be submitted to the jury. In short, for the reasons set forth above, we find that plaintiff has failed to establish that the jury ignored proven elements of damages.

¶ 61    Plaintiff next claims that the damages award resulted from prejudice. Specifically, plaintiff argues that the jury's award of damages was based upon "the parties' confidential and inadmissible settlement communications." According to plaintiff, since these communications "should have been excluded at trial, and clearly prejudiced the jury's award of damages, the award should be reversed." Having previously determined that the trial court did not abuse its discretion in admitting the communications, we reject this contention.

¶ 62    Finally, plaintiff claims that the damages award bears no reasonable relationship to the loss sustained. Plaintiff notes that the jury expressly found that plaintiff had established damages as a result of defendant's breach of contract and that plaintiff had presented evidence from which the jury could determine the fair and reasonable value of the loss. Plaintiff asserts that the only evidence of damages it presented was that called for by the jury instructions–evidence of plaintiff's "direct damages." According to plaintiff, however, the jury disregarded the evidence of its direct damages and relied instead upon inadmissible settlement evidence. Plaintiff insists that the jury should have never heard evidence of settlement communications and that its damages award should not be permitted to rest on such communications. Thus, plaintiff reasons, the jury's award did not bear a reasonable relationship to the actual damages suffered as a result of defendant's breach. Again, we reject this contention as it is premised on the theory that the trial court improperly admitted the disputed communications, an argument we have previously rejected.

¶ 63                                    2. Defendant's Cross-Appeal

¶ 64    In its cross-appeal, defendant argues that, if we award a new trial to plaintiff, the trial court's order finding defendant's Unconscionability Motion moot should be reversed and the motion should be reconsidered on remand. Because we have determined that reversal is not warranted, we dismiss defendant's cross-appeal as moot.

¶ 65                        III. CONCLUSION

¶ 66        For the reasons set forth above, we affirm the judgment of the circuit court of Du Page County and we dismiss defendant's cross-appeal.

¶ 67        Affirmed; cross-appeal dismissed.