# Illinois Official Reports

## Appellate Court

---

### *King Koil Licensing Co. v. Harris*, 2017 IL App (1st) 161019

---

| | |
|---|---|
| Appellate Court Caption | KING KOIL LICENSING COMPANY, Plaintiff-Appellant, v. ROGER B. HARRIS and FOX, HEFTER, SWIBEL, LEVIN & CARROLL, LLP, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-16-1019 |
| Filed | July 11, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-3020; the Hon. James E. Snyder, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Barnes & Thornburg LLP, of Chicago (William M. McErlean and Daniel P. Albers, of counsel), for appellant.<br><br>Hinshaw & Culbertson LLP, of Chicago (Matthew R. Henderson, Peter D. Sullivan, Joshua G. Vincent, and Adam R. Vaught, of counsel), for appellees. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Hyman and Justice Pierce concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, King Koil Licensing Company (King Koil), appeals a jury's verdict in favor of defendants, Roger B. Harris and Fox, Hefter, Swibel, Levin & Carroll, LLP (Fox Hefter), in King Koil's legal malpractice action. King Koil alleged that Harris negligently drafted a licensing agreement with King Koil's long-term licensee, Blue Bell Mattress Company (Blue Bell), causing a significant loss in revenue. The case proceeded to a jury trial in October 2015, resulting in a verdict in favor of Harris and Fox Hefter.

¶ 2    On appeal, King Koil contends that the court erred in barring the introduction of certain evidence at trial and refusing to order Harris to produce specific documents in discovery. King Koil further challenges the court's decision to allow Harris to propound special interrogatories to the jury. Finally, King Koil maintains that the jury verdict was against the manifest weight of the evidence. We find no merit in any of King Koil's arguments and affirm.

¶ 3                              BACKGROUND
¶ 4                              I. King Koil

¶ 5    King Koil licenses proprietary sleep product designs and manufacturing techniques to mattress manufacturers. Its licensees sell both King Koil branded products as well as private label products (King Koil products sold under the licensees' brand names). King Koil's income comes from licensees' payments of royalties and marketing fees based on a percentage of the licensees' sales.

¶ 6    In 2008, King Koil had 10 licensees in the United States and 30 abroad. There was no standard license agreement between King Koil and its licensees; each licensee paid a different percentage of royalties and marketing fees on its sales, with longer-term licensees paying less in royalties. Almost all of King Koil's domestic licensees paid royalties on private label sales; the purpose of this was to prevent licensees from preferring sales of their private label products over King Koil products. The only exception was that if a new licensee had an existing private label business, it would not have to pay royalties or make marketing contributions on that business. Ultimately, though, the goal was that King Koil would become the predominant part of the new licensee's business, and upon renewal of the license, King Koil could insist on royalties on private label products.

¶ 7    The minimum marketing fee licensees paid was 1% of sales, but King Koil would routinely negotiate for a higher percentage because the licensees' contributions did not completely cover King Koil's marketing expenses.

¶ 8    Beginning in 2006, and throughout this litigation, David Roberts was the president of King Koil and was responsible for negotiating license agreements with licensees. As of March 2009, he had negotiated three to five license agreements. After Roberts negotiated the business terms of a license agreement, he relied on Harris to put those terms in a contract. Since Roberts, who did not graduate from college, could not always understand the "legalese" in the contracts, he would focus on what he believed to be critical issues and would rely on Harris to explain the finer points of the agreements to him in layman's terms. For similar reasons, Roberts also preferred reading "clean" versions of drafts of the agreement as opposed to the red-lined versions that tracked the document's changes over

time. Roberts could not say whether he informed Harris that he did not review the red-lined versions.

¶ 9      Harris had been a licensed attorney since 1962 and spent the majority of his legal career at the firm of Altheimer & Gray. He began representing King Koil in 2001 while at Altheimer & Gray. When that firm dissolved in 2003, Harris joined Fox Hefter and retained King Koil as a client.

¶ 10      During his time representing King Koil at both firms, Harris prepared approximately 15 license agreements. Harris's practice when preparing license agreements was to make handwritten revisions to an existing agreement after receiving the business terms Roberts had negotiated with the licensee. Harris's secretary would then enter the handwritten revisions into the electronic version of the agreement, red-lining the changes. Harris then sent both a clean copy and a red-lined version of the agreement to Roberts, expecting that Roberts would read both.

¶ 11                                     II. Blue Bell

¶ 12      In 2008, King Koil's largest licensee in the United States in terms of sales and royalties was Blue Bell. Blue Bell had been selling mattresses under its own label since 1930, and in the early 1980s, it became a King Koil licensee. Blue Bell had two licensing agreements with King Koil: the first commencing in 1991 and covering Connecticut, Massachusetts, Maine, Rhode Island, New Hampshire, and Vermont and the second, a 1992 agreement covering several counties in New York. Both agreements had 20-year terms. Under those agreements, the royalty rate was 2% on up to $2 million in sales (on both King Koil and private label products) and 1% thereafter. Blue Bell's marketing fees were 1% of its sales. Blue Bell's royalty and marketing contributions were lower than any other King Koil licensee due in part to the age of the contracts as well as the fact that it was King Koil's largest licensee.

¶ 13             III. Negotiations Between King Koil and Blue Bell

¶ 14      The owners of Blue Bell during the time period relevant here were Mark Kolovson and his brother-in-law, Steve Byer. Roberts and Kolovson began negotiations for Blue Bell's license renewal in September 2008, about three years before Blue Bell's 1991 license expired. On September 10, Roberts sent Harris a draft agreement with Kolovson's comments, and over the next month, Roberts and Harris worked on revising the draft. Harris sent a revised working draft to Roberts on October 15, 2008.

¶ 15      This case turns on three provisions in that October 2008 draft: (1) section 1.6, defining "Total Annual Sales" as "gross sales of all Sleep Products minus only documented amounts of credits properly granted for (i) actual returns and (ii) invoicing errors related to quantities shipped or unit pricing"; (2) section 6.2(a)(ii), imposing a royalty fee of 2.75% of "licensee's Total Annual Sales of Sleep Products each Year of this Agreement"; and (3) section 6.3(a)(ii), requiring the licensee to contribute to a marketing budget managed by King Koil, which was "no less than 1% and no more than 2.5% of all U.S. licensees' Total Annual Sales of King Koil Sleep Products. (Licensee's sales to Bob's Furniture[1] are excluded from

---

[1] In 2008, Blue Bell's largest private label customer was Bob's Discount Furniture (Bob's), which only sold private label products.

Licensee's Total Annual Sales of King Koil Sleep Products for purposes of calculating the marketing budget and Licensee's contribution thereto but not for other purposes)."

¶ 16     Regarding section 6.3, according to Harris, Roberts and another King Koil executive told him orally to exempt from marketing fees both Blue Bell's sales to Bob's as well as Blue Bell's private label sales. That prompted Harris to include the above-quoted parenthetical in section 6.3(a)(ii). Harris could find no written record of that instruction, and Roberts denied so instructing Harris.

¶ 17     Roberts e-mailed the October 2008 working draft to Kolovson, but the two did not go over the agreement until March 2009. In March, Roberts and Kolovson spent five to six hours reviewing the draft in person. During the meeting, Roberts made handwritten notes on the agreement. One of the changes Roberts made was to increase the marketing contribution percentage to 1.5%, but at the time he made that handwritten change, he did not notice that the marketing contribution excluded private label sales.

¶ 18     After the meeting, on March 30, 2009, Roberts sent a letter to Kolovson attaching a term sheet for the new license agreement. The term sheet represented Roberts's understanding of the points which he and Kolovson had agreed on. Roberts copied Harris on the letter and asked him to incorporate the terms into the October 15, 2008, working draft.

¶ 19                              IV. The April 2009 Communications

¶ 20     During the time Harris was working on Blue Bell's license renewal, he was simultaneously working on a license agreement for White Dove, a new King Koil licensee. White Dove's license agreement did not require it to pay royalties or marketing fees on its private label sales.

¶ 21     On April 24, 2009, John Skelton, Blue Bell's counsel, asked Harris to provide him with White Dove's license agreement. Harris forwarded the request to Roberts, who responded in an e-mail:

> "I do not want to share or be specific regarding other agreements we may have with other licensees. Essentially, however, you should inform [Skelton] that the agreement he is working off of IS for all practical consideration [sic], the same as what we have with White Dove and others. It is not necessarily a goal of [King Koil] to have exact or similar agreements with all licensees. Each licensee is a separate entity and may have significantly different strategic value and [King Koil] reserves the position to engage and contract with each entity separately and individually."

¶ 22     According to Roberts, he meant that approximately 90% of the language in the licensing agreements was the same for all licensees and the 10% difference was in the financial terms, which he did not want to share. Roberts did not mean to instruct Harris to change the Blue Bell agreement.

¶ 23     But Harris understood Roberts's e-mail as an instruction to revise the Blue Bell agreement to reflect the terms of the White Dove agreement. In other words, Harris did not interpret Roberts's e-mail as an instruction to lie to Skelton, but to in fact ensure the Blue Bell and White Dove agreements had the same terms. The effect of merging the White Dove and Blue Bell agreements was to change the definition of "Total Annual Sales" in the Blue Bell agreement from "gross sales of all Sleep Products" to "gross sales of all *King Koil Proprietary Sleep Products* minus only documented amounts of credits properly granted for

- 4 -

(i) actual returns and (ii) invoicing errors related to quantities shipped or unit pricing." (Emphasis added.) Because the royalty provision required licensees to pay royalties on "Total Annual Sales," the changed definition of that term meant that Blue Bell had to pay royalties only on sales of "King Koil Proprietary Sleep Products" and *not* on the sale of "all Sleep Products," including private label products. The merging of the two agreements had no effect on Blue Bell's marketing fees, as the calculation already excluded sales of private label products, although merging the two agreements removed the specific reference to Blue Bell's sales to Bob's, as that was a customer unique to Blue Bell.

¶ 24    On April 27, 2009, Harris sent a clean and red-lined copy of the Blue Bell agreement with the changes, including the changed definition of "Total Annual Sales," to Roberts. Harris pointed out a blank portion in one section but, other than that, did not direct Roberts's attention to any particular provision. Specifically, Harris did not tell Roberts about the change in definition of "Total Annual Sales." According to Roberts, if Harris had told him about the change, he would not have signed the agreement.

¶ 25    Roberts probably reviewed the clean copy of the agreement on April 29, 2009, on his way to Boston with Harris to meet Skelton and Kolovson. He paid particular attention to the points he and Kolovson had discussed in March 2009. At the meeting in Boston, no one commented on the definition of "Total Annual Sales."

¶ 26                            V. Finalizing the Agreement

¶ 27    On June 24, 2009, Blue Bell suggested changes to the license agreement that Harris forwarded to Roberts. One change was in the definition of "Total Annual Sales." Specifically, Blue Bell suggested adding the language "and merchandise credit allowances in lieu of returns," so that the definition read: " 'Total Annual Sales' means gross sales of all King Koil Proprietary Sleep Products minus only documented amounts of credits properly granted for (i) actual returns and merchandise credit allowances in lieu of returns ***."

¶ 28    Roberts and Harris discussed Blue Bell's proposed changes during a phone call. Roberts told Harris that he did not agree with that language and wanted it removed. Roberts did not suggest any other changes to the definition. Because Roberts did not mention Harris's change to the definition of "Total Annual Sales" when they read through section 1.6, Harris assumed Roberts accepted that change. Harris also assumed Roberts had the agreement in front of him during the call, but Roberts denied that he was looking at the agreement while on the phone with Harris.

¶ 29    Months passed, and the agreement remained unsigned. The relationship between Roberts and Kolovson grew strained as Roberts pressed Kolovson to sign the agreement. Roberts alternatively suggested putting off the renewal and revisiting it at a later date as there was still time before the expiration of Blue Bell's licensing agreement. But Kolovson persisted in sending revisions and suggestions to Roberts throughout August 2009. Roberts complained that Kolovson "put practically everything back on the table." In a September 8, 2009, letter to Kolovson, Roberts wrote: "[W]hen you and I finished our phone calls on July 23 and 24, I thought we had finally come to agreement on all of the issues that had been in discussion and negotiation for so long. In those phone calls, you and I went over every page and paragraph of the new license agreement and agreed on all the terms; at least that was my understanding." Ultimately, after Roberts agreed to some of Blue Bell's amendments, the

agreement was signed on November 3, 2009, and went into effect on January 1, 2010.

¶ 30                  VI. King Koil Becomes Aware of the Definition of "Total Annual Sales"

¶ 31      In January 2010, Roberts learned of the definition of "Total Annual Sales" in the agreement and immediately called Harris to tell him that Blue Bell was not paying royalties or marketing fees on private label sales due to the change in definition. Harris seemed "dumbfounded" and informed Roberts he would look into it. Harris forwarded Roberts the April 27, 2009, e-mail and told him that the change in definition first appeared in that document, but Harris did not recall how it came about.

¶ 32      Roberts tried to work with Kolovson to get this "mistake" fixed and conform the contract to their agreement. For his part, in February 2010, Harris sent an e-mail to Kolovson, stating: "This situation was a mistake, and we all know it. Neither [Roberts] nor I was focused on or aware of the stated definition of Total Annual Sales in the license agreement. That definition is incorrect." Harris went on to repeat "[T]he stated definition of Total Annual Sales was a mistake. There was never, ever any discussion of any notion that less than all Sleep Products would be subject to royalty. I can't say right now how the mistake occurred; but it was a mistake." The e-mail concluded with the suggestion that the circumstances might warrant rescission or reformation of the agreement.

¶ 33      On March 12, 2010, Harris sent a letter to Skelton, on which he copied Roberts, explaining in greater detail King Koil's position and offering support for Roberts's belief that the definition of "Total Annual Sales" was never meant to exclude royalties on private label products. Also in that letter, Harris referred to the change in definition in the draft April 2009 agreement as "inadvertent." At trial, Harris testified that his use of the word reflected that the new definition "was not what [Roberts] had in mind. He didn't want that. He told me in 2010 they were supposed to pay royalties. That's what he wanted on private label. *** So it was inadvertent insofar as it changed something from what [Roberts] wanted and I wasn't aware of the fact that he wanted it." When pressed on whether Harris's change to the definition was inadvertent, Harris responded, "the result of it was inadvertent, yes, sir."

¶ 34      Roberts and Harris spoke in person in March 2010. Harris told Roberts that King Koil might have a cause of action against him and his firm, and if Roberts pursued that, Harris would have to discontinue providing legal services to King Koil. Harris also suggested suing Blue Bell. Harris still could not pinpoint how the mistake occurred but surmised that his secretary had commingled the White Dove and Blue Bell agreements inadvertently, given that they were prepared at approximately the same time.

¶ 35      Harris followed up this discussion with an e-mail and letter dated March 17, 2010, in which he again informed Roberts that King Koil might have a claim against him and his firm for the loss King Koil suffered as a result of the mistake in the licensing agreement if the mistake was due to Harris's negligence. Harris also advised Roberts of his belief that a suit against Blue Bell to reform or rescind the licensing agreement due to the mistake would likely be successful. While the letter also stated that Harris and his firm would pursue claims against Blue Bell at no cost to King Koil, this portion of the letter was redacted over King Koil's objection when the letter was admitted into evidence at trial. Harris testified that at the time he wrote the letter, he did not believe that Roberts or King Koil intended to sue him.

¶ 36    After receipt of Harris's letter, Roberts consulted with Mike Carillo,[2] an attorney at Neal, Gerber & Eisenberg and, based on Carillo's advice, opted not to sue Blue Bell. Roberts then sent a letter dated March 19, 2010, to Harris, informing him that King Koil had decided to handle the Blue Bell dispute without Harris's or Fox Hefter's involvement.

¶ 37    Over the next several months, Roberts continued to communicate with Harris regarding settlement negotiations with Blue Bell, which were being handled by Carillo. On May 7, 2010, in response to a phone call from Roberts, Harris sent Roberts an e-mail explaining how the "incorrect definition" of "Total Annual Sales" may have found its way into the agreement. Specifically, he stated that Roberts's instruction to inform Skelton that the White Dove license agreement was essentially the same as Blue Bell's prompted Harris to "think[ ] that the form of agreement to be provided to [Skelton] for Blue Bell was to be the same as White Dove, subject to particular terms agreed with Blue Bell."

¶ 38    Eventually, King Koil, with Carillo as counsel, negotiated with Blue Bell to restore a portion of the royalties (but not marketing payments) on private label sales in an amended license agreement. Under the 2010 amended agreement, Blue Bell was required to pay a 2% flat rate on royalties on private label sales, while the October 2008 draft required Blue Bell to pay a royalty rate of 2.75% on annual sales of all sleep products.

¶ 39                              VII. Expert Testimony

¶ 40    At trial, both parties presented experts who testified regarding whether Harris breached the standard of care. Philip Zeidman testified as King Koil's expert over Harris's objection that Zeidman was not licensed in Illinois and thus could not testify to the standard of care for an Illinois lawyer. Before his deposition, Zeidman reviewed only the depositions of Roberts and Harris and the exhibits attached to those depositions. Zeidman opined that Harris did not conform to the standard of care of a reasonable, diligent, and careful lawyer in preparing the license agreement. He based his opinion on his own experience, as well as on the fact that Harris did not follow Roberts's instructions to revise the licensing agreement in accordance with the term sheet Harris was provided.

¶ 41    With regard to the April 24 e-mail Roberts sent Harris about disclosing White Dove's license agreement to Blue Bell, Zeidman did not believe that the e-mail instructed Harris to redraft or amend the Blue Bell agreement. Zeidman concluded that a reasonably careful lawyer would not have interpreted this e-mail as an instruction to change the definition of "Total Annual Sales" but would have sought clarification from his client.

¶ 42    At the least, Zeidman believed a reasonably careful lawyer would have explained the significance of this change to his client. On this point, Zeidman testified that Harris's failure to call Roberts's attention to the change in definition of "Total Annual Sales" breached the standard of care, particularly in light of the fact that Harris specifically referred to other parts of the agreement that needed Roberts's attention.

¶ 43    Zeidman also testified about the marketing fee provision, which in his opinion was inconsistent. Specifically, he said that the sentence providing for marketing fees on the sale

---

[2]Carillo was formerly a partner of Harris at Altheimer & Gray who had worked on patent and intellectual property matters for King Koil. Carillo went to Neal, Gerber & Eisenberg after the Altheimer firm dissolved.

of "King Koil Sleep Products" contradicted the next sentence exempting Blue Bell's sales to Bob's from marketing fees because Bob's only sold private label products.

¶ 44    Finally, regarding the communications between the parties after Roberts learned of the changed definition of "Total Annual Sales," Zeidman believed Harris's February 2010 letter to Blue Bell evinced Harris's understanding of the "serious difficulty" Harris was in.

¶ 45    Harris relied on his own expert, Gary Leydig, an Illinois attorney who reviewed all the depositions and documents in this case to reach his conclusion that Harris did not breach the standard of care. Specifically, Leydig gave three opinions: (1) there was no mistake on Harris's part regarding the "Total Annual Sales" definition, (2) even if there was a mistake, Harris still acted as a reasonably careful lawyer, and (3) there was no mistake in the marketing fee provision.

¶ 46    In support of his first two opinions, Leydig testified that he found Roberts's April 2009 e-mail ambiguous. According to Leydig, Harris's conduct in sending Roberts the red-lined version of the licensing agreement with the changed definition was sufficient to meet the standard of care as it called Roberts's attention to the changes from the earlier draft. As to his third opinion, Leydig stated that the section 6.3 definition, exempting non-King Koil products from marketing fees and then specifying that sales to Bob's (which only sold private label products) were also exempt, was not conflicting but redundant, and such redundancies are commonly seen in contracts.

¶ 47    Leydig testified that he gave the post-February 2010 communications little weight because they were aggressive posturing between litigators. In particular, according to Leydig, Harris's use of "mistake" in his letter to Skelton to describe the definition of "Total Annual Sales" was an argument on behalf of his client.

¶ 48                          VIII. Evidentiary Issues at Trial

¶ 49    Over the course of approximately three years of pretrial proceedings, the trial court made several rulings concerning the admission of evidence, two of which are relevant to this appeal.

¶ 50    First, in March 2012, King Koil moved to compel production of the documents listed in Harris's privilege log, which the trial court denied. The privilege log listed nine e-mails between Harris and other attorneys at Fox Hefter sent between February and March 2010, as well as Harris's handwritten notes. Harris argued that the e-mails were protected by the attorney-client privilege, while his notes were protected by the work-product privilege. In its ruling of June 8, 2012, the court held that it had reviewed the documents in the privilege log and agreed with Harris that they were protected from disclosure under the attorney-client and work-product privilege "because they related to the potential legal malpractice claim of [King Koil]."

¶ 51    King Koil filed a motion to reconsider, arguing in part that no attorney-client relationship existed between Harris and other attorneys at Fox Hefter. Harris reiterated his argument that a privilege existed and referred to the e-mail correspondence between the attorneys as "loss-mitigation communications." Ultimately, the court denied the motion for reconsideration based on the work-product privilege.

¶ 52    The second evidentiary ruling relates to Harris's motion *in limine* to exclude evidence that he offered to represent King Koil free of charge in litigation against Blue Bell to reform

or rescind the license agreement. These statements were made in letters and e-mails from Harris to Roberts, dated March 17, 2010, and May 11, 2010, as well as Harris's personal notes to himself. The trial court determined that the offer to perform legal work free of charge was barred by Illinois Rule of Evidence 408, which renders inadmissible evidence offering or promising to furnish consideration to compromise a claim. Ill. R. Evid. 408(a) (eff. Jan. 1, 2011). King Koil objected, based in part on the affirmative defense asserted by Harris and Fox Hefter that King Koil failed to mitigate damages by declining Harris's offer to pursue, free of charge, claims against Blue Bell to reform or rescind the agreement. The court rejected this argument because defendants withdrew this affirmative defense in advance of trial.

### IX. Jury Instructions and Special Interrogatories

The parties agreed that the case should be tried on pure comparative negligence, and as a result, the jury was presented with three verdict forms: one finding in favor of King Koil, one finding in favor of Harris and Fox Hefter, and a third finding in favor of King Koil but apportioning negligence between King Koil and Harris. If the jury returned a verdict in favor of King Koil, Harris asked for the following special interrogatories:

"(1) Has [King Koil] proven that 'but for' [Harris's] alleged negligence, Blue Bell would have agreed to pay a royalty in excess of 2% on the sale of private label sleep products in the license agreement that was signed November 3, 2009.

(2) Has [King Koil] proven that 'but for' [Harris's] alleged negligence, Blue Bell would have agreed to make marketing budget contributions on the sale of private label sleep products in the license agreement that was signed November 3, 2009."

King Koil objected to these interrogatories contending that they were contrary to the definition of proximate cause in the jury instruction, which read: "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury." The court granted Harris's request to propound special interrogatories but allowed King Koil to redraft the interrogatories to reflect "an accurate statement of what the jury would have to find."

The next day, King Koil reiterated its objection and maintained that the special interrogatories were not necessary but proposed an alternative to conform to its understanding of the proximate cause instruction. Specifically, King Koil proposed the following interrogatories:

"(1) Has King Koil proven that [Harris's] alleged negligence caused, in the natural or ordinary course of events, Blue Bell to pay less than 2.75% in royalties on sales of private-label sleep products?

(2) Has King Koil proven that [Harris's] alleged negligence caused, in the natural or ordinary course of events, Blue Bell not to pay marketing budget contributions on sales of private-label sleep products?"

The court tendered King Koil's interrogatories over Harris's objection. The jury returned a verdict in favor of Harris and Fox Hefter and thus did not answer the interrogatories. After the posttrial motion was denied, King Koil timely appealed.

ANALYSIS

¶ 58    On appeal, King Koil raises several grounds in support of its request for a new trial; the first of which is its claim that it is entitled to a new trial because the jury's verdict was against the manifest weight of the evidence. See *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003) (jury verdict subject to reversal only if it is against the manifest weight of the evidence). Specifically, King Koil contends that Harris admitted the changed definition of "Total Annual Sales" was a mistake, and therefore, the jury could not have relied on Leydig's testimony that Harris either did not make a mistake or did not know he made a mistake. King Koil also argues that it produced evidence that Harris's negligence was the proximate cause of its injuries.

¶ 59    A verdict is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 53 (2009). "It will not suffice to show that the record will support a contrary decision; rather, if the record contains any evidence to support the trial court's judgment, the judgment should be affirmed." *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 488 (2004).

¶ 60    In order to prevail on a claim for legal malpractice, a plaintiff must prove (1) the existence of an attorney-client relationship giving rise to a duty on the part of the attorney, (2) a negligent act constituting a breach of that duty, (3) that "but for" the attorney's negligence, plaintiff would have prevailed in the underlying action, and (4) actual damages. *Wolfe v. Wolf*, 375 Ill. App. 3d 702, 709 (2007).

¶ 61    Here, the parties dispute whether there was evidence supporting the jury's verdict in favor of Harris and Fox Hefter. King Koil maintains that Harris admitted that the definition of "Total Annual Sales" was a mistake, and this admission is tantamount to a breach of duty.

¶ 62    In support of its position that Harris admitted his mistake, King Koil points to Harris's testimony agreeing that in January 2010 he understood that there had been a "mistake in the definition of total annual sales" as to royalties. In addition, King Koil cites the e-mail Harris wrote to Roberts in February 2010, in which Harris noted that the definition of "Total Annual Sales" in the agreement was "incorrect." Finally, King Koil notes that in a letter to Skelton dated March 12, 2010, Harris referred to the change in definition as "inadvertent."

¶ 63    But the jury could have accepted Leydig's testimony that even if Harris made a mistake, he did not breach the standard of care. Given Harris's longstanding custom of preparing clean and red-lined versions of agreements and forwarding them to Roberts, and in view of the lack of evidence that Roberts ever told Harris that he found it "difficult" to read red-lined versions and thus did not review them, the jury could have found that Harris acted as a reasonably careful lawyer. *Fox v. Seiden*, 2016 IL App (1st) 141984, ¶ 25 (a client is not entitled to perfect representation, but only "representation commensurate with the skill and care ordinarily used by a reasonably well-qualified attorney under similar circumstances"). This is especially true given (i) the length of time between the change and execution of the contract, (ii) the relative simplicity of the definition of "Total Annual Sales" and its importance in driving the financial terms of the agreement, and (iii) Roberts's assertion, months after the new definition of "Total Annual Sales" had been inserted and months before the agreement was signed, that he had gone over "every page and paragraph" of the agreement with Kolovson.

¶ 64    And even if we agree with King Koil's characterization of Harris's statements as admissions of a breach of the standard of care, reversal would not be warranted. What King Koil overlooks is that the jury could have found that Harris was negligent but that his negligence did not proximately cause King Koil's damages due both to (i) Roberts's many opportunities to review the definition of "Total Annual Sales" and his failure to tell Harris that he did not agree with its terms and (ii) the lack of any proof that Blue Bell would have agreed to those terms.

¶ 65    First, the provisions for royalties on the sales of King Koil products were at the heart of the licensing agreement. These provisions were not "legalese" that Roberts needed Harris to explain to him: the four-line definition of "Total Annual Sales" did not contain legal terms and was written in plain English. Indeed, Roberts admitted he had to focus on this very provision in considering a change to the definition proposed by Blue Bell. Thus, the jury could have found that even if Harris breached the standard of care in incorporating the White Dove definition of "Total Annual Sales" into the Blue Bell contract, that breach did not proximately cause King Koil's loss given Roberts's repeated opportunities to review that provision before he signed the contract.

¶ 66    Second, Harris argued at trial that King Koil could not establish that his negligence was the proximate cause of its damages given the lack of any evidence that Blue Bell would have agreed to the terms Roberts said should have been in the final agreement. See *Green v. Papa*, 2014 IL App (5th) 130029, ¶ 33 (proximate cause in legal malpractice case requires plaintiff to prove that "but for" the attorney's negligence, the plaintiff "would have been successful in the undertaking the attorney was retained to perform"). King Koil points to the terms of the old license agreements that included royalties and marketing payments on private label sales and Blue Bell's postdispute agreement to restore a portion of the royalties (but not marketing contributions) on those sales.

¶ 67    But while the jury could have accepted King Koil's argument, it was not required to. Roberts negotiated the new license agreement with Kolovson for over a year. Obviously, the financial terms of the agreement were key, and Roberts handled those negotiations directly with Kolovson. King Koil sought and attained a substantial increase in royalties on its proprietary sleep products. Roberts, who admitted that he reviewed every page and paragraph of the new agreement with Kolovson in late July, complained in September that Blue Bell had put "practically everything back on the table." Given the financial significance of the marketing contributions on private label sales—nearly $6 million over the life of the agreement, according to King Koil's damage calculation—the jury could have concluded that there was no showing of proximate cause because there was no proof that Blue Bell would have agreed to this significant term. The jury could further have concluded that Blue Bell's agreement to restore a portion of the royalties on private label sales—a relatively minor $300,000—was an effort to maintain good relations with King Koil, its long-time licensor, and was not a concession that those sales should have been included in royalties in the first place.

¶ 68    King Koil further argued that the term sheet of March 30, 2009, which made no mention of the definition of "Total Annual Sales," serves as proof that Blue Bell agreed to the definition as set forth in the October 2008 draft that included both sales of King Koil and private label products. In the first place, the term sheet represented only Roberts's notes of what the parties agreed to; Blue Bell made no contribution or comments to that document.

And the fact that it took over six months for the agreement to be signed after Harris incorporated the term sheet's provisions into the October 2008 draft suggests that the sheet did not address all of Blue Bell's issues with the agreement. Indeed, Blue Bell suggested a change to the "Total Annual Sales" definition in June 2009 despite the fact that no mention of that definition was made in the term sheet.

¶ 69    Given the jury's general verdict in favor of Harris and Fox Hefter, we are unable to determine which necessary element of King Koil's malpractice claim the jury found lacking. See *Claro v. DeLong*, 2016 IL App (5th) 150557, ¶ 21 (where jury enters a general verdict, court does not know on what basis it made its findings (citing *Maple v. Gustafson*, 151 Ill. 2d 445, 449 (1992))). And because (i) the failure to prove proximate cause provides an independent basis to uphold the jury's verdict and (ii) the evidence was sufficient to show that King Koil's damages stemmed not from Harris's drafting error but from other causes, including Roberts's inattention to the business terms of the agreement he negotiated, we reject King Koil's sufficiency of the evidence argument.

¶ 70    As to the trial court's evidentiary rulings, King Koil first argues that the court erred in barring evidence pursuant to Illinois Rule of Evidence 408 (eff. Jan. 1, 2011) that Harris and Fox Hefter offered to represent King Koil in its dispute with Blue Bell free of charge. We review a trial court's decision on the admissibility of evidence pursuant to Rule 408 for an abuse of discretion. *Control Solutions, LLC v. Elecsys*, 2014 IL App (2d) 120251, ¶ 38. A court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with its position. *Id.*

¶ 71    As a general rule, offers of compromise or settlement are inadmissible at trial. *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 861 (1998). This principle is codified in Illinois Rule of Evidence 408, which provides that evidence "furnishing or offering or promising to furnish *** a valuable consideration in compromising or attempting to compromise the claim" is inadmissible if the evidence is offered to prove liability for a claim that was disputed as to its validity or amount. Ill. R. Evid. 408(a)(1) (eff. Jan. 1, 2011). "[T]he existence of a dispute is at the very core of whether communications are inadmissible under Rule 408," and the burden is on the party seeking exclusion of the communication to make a substantial showing that it was an attempt to settle a disputed claim. *Control Solutions, LLC*, 2014 IL App (2d) 120251, ¶¶ 38, 40. In considering the question of admissibility, a court must examine the "totality of the circumstances," including the content of the communication and its timing. *Id.* ¶ 38.

¶ 72    Here, the relevant communications took the form of two e-mails, a letter, and Harris's handwritten notes. On March 17, Harris e-mailed Roberts stating that Fox Hefter would "absorb[ ] all expenses out of the contemplated suit with Blue Bell, the point you raised when you and I talked yesterday." In the letter attached to the e-mail, Harris repeated "[a]ssuming you approve, we would prosecute such a suit for a declaratory judgment on King Koil's behalf without any charge to King Koil." Then, on May 11, 2010, in another e-mail to Roberts summarizing Harris's assessment of King Koil's likelihood of success in a lawsuit with Blue Bell, Harris again stated "[a]s previously expressed, if [King Koil] decides to have our firm represent it in pursuing any litigation with Blue Bell, there would be no fee or expense to [King Koil]." Finally, in undated handwritten notes, Harris wrote that work for King Koil regarding the "issue w/Blue Bell" would be done without charge. In both the letter and the e-mails, Harris expressly stated that King Koil's acceptance of Fox Hefter's offer

would not constitute a waiver of any legal malpractice claim King Koil might wish to pursue against Harris or Fox Hefter.

¶ 73    The court did not abuse its discretion in finding that these communications were inadmissible as offers to compromise a claim. First, there is no question that a dispute existed at the time Harris made these offers. In fact, Harris referenced the dispute in both the March 17 letter and the May 10 e-mail, noting that "King Koil could have a claim against me and my law firm for any loss King Koil suffers if I was negligent in my representation of King Koil in preparing the license agreement." And in the May 10 e-mail to Roberts, Harris opined that he did not believe a claim against him or his firm had merit. Second, despite Harris's acknowledgment that King Koil's acceptance of his offer of free representation would not preclude King Koil from alleging malpractice against Harris or Fox Hefter, the offer was nevertheless an attempt to negate the basis for a malpractice claim. If King Koil accepted the offer and Harris successfully secured a verdict in favor of King Koil (which he believed he would), then any cause of action King Koil would have against Harris and Fox Hefter would be meritless. Specifically, King Koil would not be able to prove that it was damaged by Harris's alleged breach of duty.

¶ 74    King Koil disputes that Harris's offer of free representation was intended as a settlement offer, arguing that Harris admitted as much. King Koil cites the statement by defense counsel that "the idea that this is a settlement communication developed much later on[.]" But this statement was made to explain to the court why Harris and Fox Hefter were seeking to withdraw their affirmative defense, in which they alleged that King Koil failed to mitigate its damages by declining to accept the offer of free representation. The full statement reads: "Judge, we did the affirmative defenses way at the very beginning of the case. Okay? They filed their complaint, we did a motion to dismiss, then filed our answer with the affirmative defenses. *This defense and the idea that this is a settlement communication developed much later on, Judge.*" (Emphasis added.) The context establishes that counsel was not referring to Harris's state of mind when he made those offers but to the changed theory of the case that prompted Harris and Fox Hefter to withdraw the affirmative defense.

¶ 75    King Koil makes a separate argument for the admissibility of Harris's withdrawn affirmative defense. While Harris maintains that the withdrawal of this defense precluded its use as evidence during trial, we agree with King Koil that an unverified pleading is ordinarily admissible as an evidentiary admission even if it is withdrawn or amended. See *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 557-58 (2005). Nevertheless, as Harris points out, the admission in the affirmative defense is subject to ordinary rules of admissibility. *Cf. People v. Sifuentes*, 248 Ill. App. 3d 248, 251 (1993) (holding that inadmissible confession did not become admissible merely because expert relied on it in reaching his conclusion). And as discussed *supra* ¶ 71, Rule 408 prohibits the admission of evidence that an offer to compromise a claim was made. Thus, despite the fact that the affirmative defense itself was not an offer to compromise a claim, it was evidence that such an offer was made and was inadmissible for that reason.

¶ 76    We also reject King Koil's argument that Harris waived protection of the offer under Rule 408 by pleading the affirmative defense in the first place. A waiver is an affirmative act intentionally relinquishing a known right. *State Farm Mutual Automobile Insurance Co. v. Easterling*, 2014 IL App (1st) 133225, ¶ 23. Rule 408 does not bestow a right upon litigants but is a rule regarding the admissibility of evidence. The withdrawal of the affirmative

defense shows that Harris did not intend to waive the ability to exclude the offer under Rule 408.

¶ 77    Our conclusion that the court did not abuse its discretion in barring evidence of these offers of compromise finds support in Illinois's public policy favoring settlement prior to trial. The reason settlement offers and negotiations are inadmissible is because their use as evidence may discourage litigants from making such offers in the first place, lest they be used against them at trial. *Liberty Mutual Insurance Co. v. American Home Assurance Co.*, 368 Ill. App. 3d 948, 960 (2006); see also *Morgan v. Richardson*, 343 Ill. App. 3d 733, 740 (2003). And King Koil admits that this is precisely the purpose for which it sought to admit the offer here, describing that it would have demonstrated to the jury Harris and Fox Hefter's "admissions as to liability." Not only is this incorrect as a matter of law (an agreement to settle does not constitute an admission of guilt (*Liberty Mutual Insurance Co.*, 368 Ill. App. 3d at 960)), but such usage is contrary to public policy. And, in any event, the jury heard evidence regarding Harris's repeated references to the "mistake" in the definition of "Total Annual Sales" and, thus, the redacted offer of free representation and the excluded evidence regarding his offers to ameliorate the effect of the mistake would not have changed the outcome.

¶ 78    King Koil next challenges the court's ruling declining to order disclosure of certain documents identified in Harris's privilege log. Initially, the court found the documents were subject to the attorney-client and work-product privileges but, on reconsideration, determined that the documents were protected primarily under the work-product privilege. We review a court's decision concerning the application of privileges *de novo. Sherman v. Ryan*, 392 Ill. App. 3d 712, 735 (2009).

¶ 79    The work-product privilege is outlined in Illinois Supreme Court Rule 201(b)(2), which provides in relevant part that "[m]aterial prepared by or for a party in preparation for trial is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney." Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013); see also *BorgWarner, Inc. v. Kuhlman Electric Corp.*, 2014 IL App (1st) 131824, ¶ 24. The documents Harris sought to protect from disclosure were e-mails he exchanged with another associate at Fox Hefter, e-mails he wrote to a principal at the firm, and certain handwritten notes. These documents were made available to us under seal, and our review reveals that they were properly withheld as work product.

¶ 80    King Koil's argument to the contrary rests on its belief that Harris provided "no evidence" that the documents were protected under the work-product privilege. But it is unclear what evidence King Koil wanted Harris to provide besides the documents at issue, which speak for themselves. Harris also argued in support of the work-product privilege at the hearing on King Koil's motion for reconsideration. This was more than enough to sustain Harris's burden to prove that the documents were privileged. And the court was certainly entitled, after review of the documents in camera, to accept Harris's arguments that they related to Harris's and Fox Hefter's internal investigation of the malpractice claim.[3] It is of

---

[3]King Koil erroneously contends that the court withheld these documents under a heretofore unrecognized "loss-mitigation privilege." Nowhere does that term appear in the transcript. Rather, Harris referred to them as "loss-mitigation *communication*," and more generally, as "loss mitigation"; the court did not use the term at all.

no moment that the documents were prepared while Harris and Fox Hefter still represented King Koil; the documents did not directly relate to that representation but instead contained Harris's and Fox Hefter's litigation plans to defend themselves against a malpractice claim.

¶ 81    Even assuming that the court's ruling applying the privilege was erroneous, our review of the documents leads us to conclude that this error did not prejudice King Koil. See *Fox Moraine, LLC v. United City of Yorkville*, 2011 IL App (2d) 100017, ¶ 69 (reviewing ruling on privilege for harmless error). To the extent the withheld documents contain Harris's admission to a mistake in drafting the licensing agreement (and we do not necessarily believe they do), the "admission" is cumulative of the evidence discussed above that was properly before the jury on the issue of breach of duty. Nor do the documents bear on either proximate cause or damages. Thus, even if we disagreed with the trial court's ruling, it would not entitle King Koil to a new trial.

¶ 82    Finally, King Koil argues that the trial court erroneously allowed Harris to propound special interrogatories to the jury. We need not reach the merits of this argument for two reasons. First, King Koil has waived its objection to the interrogatories because, although it challenged the interrogatories Harris proposed, it accepted the court's offer to submit redrafted interrogatories to conform to King Koil's understanding of the law on proximate cause. Thus, it was King Koil's rather than Harris's interrogatories that were given to the jury over Harris's objection. King Koil cannot now be heard to complain that the interrogatories it drafted "misstated the law" and "did not test the general verdict." See *Stephenson v. Dreis & Krump Manufacturing Co.*, 101 Ill. App. 3d 380, 387 (1981) ("[A] party cannot allow the jury to receive an instruction without specific objection and then for the first time in a post-trial motion or an appeal claim that error was committed."). Second, the jury returned a verdict in favor of Harris and so did not reach the interrogatories, which were intended to test a verdict in favor of King Koil. King Koil argues that the interrogatories could have "confused" the jury, even though the jury was not required to answer them if it found in favor of defendants. King Koil has not cited, and we are not aware of, any authority that a jury verdict can be overturned based on special interrogatories prepared by the objecting party that, in any event, the jury never answered. Thus, King Koil suffered no prejudice from the use of those interrogatories.

¶ 83    Affirmed.